IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 8, 2013

**CLARENCE DEWAYNE HAYES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2006-B-1257      Seth Norman, Judge**

---

**No. M2013-00605-CCA-R3-PC   Filed October 17, 2013**

---

The petitioner, Clarence Dewayne Hayes, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief, in which he alleged the ineffective assistance of trial counsel and the misconduct of the prosecutor. We affirm the order of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and ROGER A. PAGE, JJ., joined.

Ryan C. Caldwell, Nashville, Tennessee, for the appellant, Clarence Dewayne Hayes.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Davidson County Criminal Court jury convicted the petitioner of felony murder in 2008, and the trial court sentenced him to life in prison. This court affirmed the conviction in 2010. *See State v. Clarence D. Hayes*, No. M2008-02689-CCA-R3-CD (Tenn. Crim. App., Nashville, Dec. 23, 2010), *perm. app. denied* (Tenn. May 25, 2011). In June 2011, the petitioner filed the petition for post-conviction relief now under review. After the appointment of counsel and substitute counsel and an amendment of the petition, the post-conviction court held an evidentiary hearing.

We turn to our opinion in *Clarence D. Hayes* to review the evidence presented at trial:

Iola Hudson testified that she was the mother of Monique Greer and Tamika Hudson. She said that Tamika Hudson's nine-year-old son, M.H., was in third grade when he was killed. Ms. Hudson testified that Mrs. Greer had a daughter with the [petitioner], and they used her home as a "drop-off and pick-up point" for their daughter when the [petitioner] had visitation. She said that the [petitioner] told her that he hated Mrs. Greer's husband, William Greer, and that "[h]e had people that would do things."

The [S]tate requested a jury-out hearing to proffer testimony regarding a prior bad act of the [petitioner]. After hearing the testimony, the trial court found that the evidence showed animosity between the parties involved and that the probative value outweighed the prejudicial effect. The court ruled that testimony regarding the prior bad act was admissible.

The [S]tate resumed Ms. Hudson's direct examination. She testified that on one occasion, the [petitioner] stayed at her house after bringing his daughter there. Mr. and Mrs. Greer arrived to pick up the child, and when Ms. Hudson answered the door, the [petitioner] "jumped up off the couch and pulled a gun out of his pocket and cocked it." Ms. Hudson said that she stepped between the [petitioner] and the Greers, and she pushed the Greers outside.

On cross-examination, Ms. Hudson testified that the [petitioner]'s gun did not have a hammer. She said that she did not consider calling the police about the incident.

Monique Greer testified that she had one daughter with the defendant. She had two children with her husband and a fourth child from a previous relationship. Mrs. Greer testified that her sister, Tamika Hudson, had three children, one of whom was the victim in this case. Mrs. Greer explained that the court ordered the [petitioner] to pay child support for their daughter, but he did not pay. She said that they repeatedly went to court about the child support payments. The relationship between her and the [petitioner] worsened after she married Mr. Greer. The [petitioner] "[c]onstantly" told her "[t]hat he wanted to F that

-2-

young N up." He also told her that he wanted their family back together. Mrs. Greer said that the normal procedure when the [petitioner] had visitation with their daughter was that Mrs. Greer would take their daughter to her mother's house, and the [petitioner] would pick her up. On one occasion, the [petitioner] was at Ms. Hudson's house when Mr. and Mrs. Greer arrived, and he pulled a gun on Mr. Greer. Mrs. Greer said that she had to push her husband outside. She testified that the [petitioner] had a telephone harassment warrant taken out against her because she called him repeatedly to have him return their daughter to her after their daughter had called her saying that she wanted to come home. Mrs. Greer said that her "attorney got [the case] bound over to the grand jury and returned it was [sic] dismissed." Mrs. Greer recalled that on March 21, 2006, she and her husband went to court against the [petitioner]. She denied vandalizing the [petitioner]'s Jeep Cherokee that day. That evening, she, her husband, her four children, and her nephew, the victim, were at her home. The children, except for the oldest who was in his room, were playing in the living room. She and Mr. Greer were preparing to go to bed when her daughter knocked on their bedroom door, saying that someone was at the door. Mr. Greer went to answer the door. Mrs. Greer testified that the next thing she recalled was her husband telling them to run because "he got a gun." She said that three of the children ran past her into a closet, and she hid behind a door. Her nephew told her that he had been hit, and he laid across the bed. She picked him up, took him to the hallway, and applied pressure to the wound. She went with him to the hospital after an ambulance came. Mrs. Greer said that she spoke to police that night and told them that she suspected the [petitioner].

On cross-examination, Mrs. Greer testified that she did not call police after the [petitioner] pulled a gun on her husband because she "felt like [they] diffused the situation by leaving." She agreed that she attempted to take out an order of protection against the [petitioner] in January 2006, but the court had issued a mutual stay-away order, effective for three months, instead. Mrs. Greer testified that the [petitioner] had visitation with their daughter every other weekend. She said that it was her daughter's decision whether the [petitioner] was in her life, but

if it were her decision, she would not want the [petitioner] in their lives.

William Greer testified that he had been married to Monique Greer for five years, and they had two children together. Mr. Greer said that his nickname was Shooby. He knew the [petitioner] because Mrs. Greer had a daughter with him. Mr. Greer recalled that he had seen the [petitioner] with a gun on one occasion. He testified that he and Mrs. Greer were picking up her daughter from her grandmother's house, and the [petitioner] was there. He said that when they came through the door, the defendant jumped up from the couch and pulled out a small chrome .380 caliber semi-automatic pistol. Mr. Greer said that it did not have a hammer and was made by either Lorcin or Jennings.

Mr. Greer testified that he and his wife saw the [petitioner] in court on March 21, 2006. He denied doing anything to the [petitioner]'s car that day. That evening, his nephew, M.H., was visiting the Greers' house. The children were playing in the living room, and he and Mrs. Greer were preparing to go to bed. Mrs. Greer's daughter knocked on the bedroom door and told them that someone was at the door. Mr. Greer said that he went to answer the door, and two of the children followed him. He spoke to the man outside through the window next to the door. The man told him, "Tori sent me down here to give you something." Mr. Greer said that he looked down and saw that the man had a gun in his hand. He told the children to run. Mr. Greer said that the children ran by him, and he heard five to six shots. Mrs. Greer told him that M.H. was hit, but he did not believe her until she brought him into the hallway. Mr. Greer called 9-1-1. Mr. Greer said that the man shot through the door, and neither he nor the man opened the door. Mr. Greer said that he had never seen the man before, but he was wearing a gold hooded sweatshirt, with the hood pulled over his head. He could see "[t]he shaping of [the man's] face." Mr. Greer testified that the gun he saw was the same gun that the [petitioner] had at Ms. Hudson's house. He said that when he spoke to police that night, he told them that he suspected the [petitioner]. The police showed him a photo array,

-4-

but he did not see the shooter in the photographs. His friend, Talone Mayes, showed him a photograph of Timothy Cartwright, and Mr. Greer recognized Mr. Cartwright as the shooter. He took the photograph to Detective Fitzgerald. He further testified that he did not know anyone named Kelvin Burke.

On cross-examination, Mr. Greer testified that he became familiar with guns by watching his uncle, a gunsmith. He said that his understanding was that when the shooter came to the door, his daughter opened the door and closed it again when she went to tell her mother someone was asking for her. Mr. Greer said that he assumed the [petitioner] was behind the shooting because he did not have any enemies, and the [petitioner] was his wife's only enemy.

Natalie Broadway, a victim-witness coordinator for the district attorney general's office, testified that on March 21, 2006, the [petitioner] had a court date regarding the telephone harassment warrant he had obtained against Mrs. Greer. After the court appearance, the [petitioner] informed Ms. Broadway that someone had vandalized his vehicle while he was in court.

Kelvin Burke testified that he knew both the [petitioner] and Mr. Greer. He said that the [petitioner] offered him a few thousand dollars to shoot Mr. Greer, whom he knew as Shooby, because he felt that Mr. Greer was interfering with his visitation with his daughter. After the [petitioner] called him to inquire whether he would accept the proposition, Mr. Burke told a homicide detective with the Metropolitan Nashville Police Department what the [petitioner] had asked him to do. He said that he was concerned about being implicated if anything happened. After M.H. was killed, Mr. Burke saw the [petitioner] again, and the [petitioner] told him that he wished that Mr. Burke had taken the offer because Timothy Cartwright, also known as La T, "just did things all wrong because he was on that dope. . . ." Mr. Burke testified that the [petitioner] told him, "I saw my baby open the door and that fool almost killed my own child." The [petitioner] did not tell him how much he paid Mr. Cartwright. The [petitioner] told him that the only

thing the [S]tate had against him "was a cell phone," but his defense was that a friend of his had his cell phone.

On cross-examination, Mr. Burke agreed that he had convictions for especially aggravated burglary and smuggling contraband into a penal institution. He further agreed that authorities had revoked his parole, and he was awaiting his revocation hearing. He said that the district attorney general's office sent a letter to the parole board on his behalf to have his parole hearing moved to an earlier date. Mr. Burke said that he wrote several letters to various agencies and to the assistant district attorney general. He agreed that he told the assistant district attorney general who met with him that the [petitioner] said that he rode with Mr. Cartwright to the Greers' house because Mr. Cartwright did not know where it was. Mr. Burke testified that the [petitioner] told him that he saw his daughter through the door and that at some point Mr. Cartwright began shooting into the house.

On re-direct examination, Mr. Burke testified that in several of the letters, he said that he did not want special treatment for his information.

Sergeant Frank Ragains, with the Metropolitan Nashville Police Department, testified that he collected five shell casings from an area to the right of the Greers' front porch. He located five bullet holes in the Greers' front door. He found projectile strike marks inside the residence and recovered two projectiles. Sergeant Ragains testified that at least one projectile might have lodged in the victim's body, and he made the decision not to recover other projectiles lodged in the Greers' wall and sofa because recovering the projectiles would require him to tear up the wall and sofa.

Tennessee Bureau of Investigation Special Agent Steve Scott testified as an expert in firearms examination. He testified that the casings found outside the Greers' home and the projectiles found inside were .380 auto caliber bullets fired from the same firearm. He did not have a firearm with which he could make a comparison, but he said that Lorcin and

-6-

Bryco-Jennings both made .380 auto pistols. He said that the rifling on the projectiles was consistent with pistols made by Lorcin, Bryco-Jennings, and others. Agent Scott testified that Lorcin and Bryco-Jennings made pistols that did not have hammers.

Dr. Amy R. McMaster testified as an expert in forensic pathology. She said that she works for Forensic Medical, a private company that contracts with Davidson County to provide death investigation services. Dr. McMaster testified that M.H. had two gunshot wounds. One bullet entered the left side of his back and exited the right side of his chest. The second bullet entered the back side of his left thigh and exited the front of his left thigh. Dr. McMaster categorized the wound to his torso as fatal, but the wound to his thigh 'would not necessarily have been fatal.' She testified that M.H.'s cause of death was multiple gunshot wounds, and his manner of death was homicide.

Metropolitan Nashville Police Detective Eric Fitzgerald testified that in March 2006, he was a detective in the youth services division. He was responsible for investigating M.H.'s death. Monique and William Greer gave him the [petitioner]'s name as a suspect. From police reports filed by the [petitioner], Detective Fitzgerald obtained his home address and three phone numbers, two of which were cell phones. The cell phone numbers were 506-0736 and 715-5345. Detective Fitzgerald interviewed the [petitioner] at his attorney's office. During the interview, Detective Fitzgerald observed that the [petitioner] carried two cell phones. The [petitioner] told him that he was playing cards with Eric Whitfield, Tracy Mayes, and Valencia Mathers when M.H. was killed. He interviewed all three alibi witnesses. Ms. Mathers was the [petitioner]'s sister. Ms. Mayes lived in the apartment below Ms. Mathers. When Detective Fitzgerald went to Ms. Mayes's apartment, a male was making breakfast in the kitchen. Detective Fitzgerald later learned that the male was Timothy Cartwright. Detective Fitzgerald obtained the records related to the [petitioner]'s 0736 number, and, after he learned that the [petitioner] also had a cell phone with the number 715-5345, he obtained the records for that

number as well. When he reviewed the records, the number 506-6781 appeared repeatedly. Detective Fitzgerald learned that the 6781 number belonged to Timothy Cartwright, and he obtained the records for that number also.

The cell phone records contained the locations of the cell phone towers used during each call. The detective prepared a map showing the locations of the cell phone towers used by the [petitioner]'s phone around the time of M.H.'s murder. Beginning at 8:05 p.m., the [petitioner]'s phone was using a tower near where the [petitioner] lived. At 8:46, the phone hit off a tower on Lebanon Pike. Between 9:03 and 9:22 p.m., the phone was using a tower on New England Drive. Detective Fitzgerald testified that a person could see the cell tower on New England Drive from the Greers' front yard. He said that the murder occurred at approximately 9:20 p.m. Detective Fitzgerald testified, "[The map] shows a track over to the murder site[,] there for around 30 minutes around the time of the murder[,] and coming back for the rest of the night." Detective Fitzgerald said that two of the [petitioner]'s phones were used in that time period. He said that the records showed the [petitioner] making three calls to his sister during that time. Timothy Cartwright's cell phone records showed that his phone traveled the same path as the [petitioner]'s, but he turned his phone off from 8:50 p.m. until 10:30 p.m. The first call that Mr. Cartwright made after turning the phone back on was to the [petitioner].

Detective Fitzgerald said that neither Mr. Greer nor the [petitioner] and Mrs. Greer's daughter were able to identify Mr. Cartwright in a photo array. Mr. Greer later came to him with a photograph of Mr. Cartwright and said that he was the man who shot his nephew. Detective Fitzgerald said that he came into contact with Kelvin Burke in connection to another case. In the course of interviewing Mr. Burke, he asked him whether he was familiar with the [petitioner] or Timothy Cartwright. Mr. Burke indicated that he was and that he had information about M.H.'s murder.

On cross-examination, Detective Fitzgerald testified that

he investigated two other men in connection with the murder. One man was in jail when it occurred, and he was unable to find a link between the second man and the murder. He executed a search warrant for the second man's apartment and located a brown sweatshirt but nothing else that might connect him to the murder. Detective Fitzgerald said that the cell phone records did not reveal whether a phone used a particular tower because the closest tower was "max[e]d out." He agreed that he interviewed a third person, Mr. Patrick Hancock, in the course of the investigation who used a cell phone that was in the [petitioner]'s name with the number 586-7332. Regarding his interaction with Kelvin Burke, Detective Fitzgerald said that Mr. Burke wrote to him asking whether his parole hearing could be moved to an earlier date.

On re-direct examination, Detective Fitzgerald testified that there were twenty-four phone calls between the [petitioner] and Timothy Cartwright from 10:25 p.m. on March 21 through March 22. He said that he executed a search warrant for Mr. Cartwright's residence and located a brown hooded sweatshirt.

On re-cross-examination, Detective Fitzgerald agreed that the cell phone records did not show who was actually using the phone in question.

*Id.*, slip op. at 1-7.

In the post-conviction hearing, the petitioner called Eric Fitzgerald, a detective with the Metro Nashville Police Department, to testify. Detective Fitzgerald was the lead investigator in the homicide of M.H. in March 2006. He testified that the petitioner had not been getting along well with William Greer, the husband of the mother of the petitioner's child. The two had an altercation during which the petitioner had "pulled a gun on Mr. Greer." The investigation revealed that the victim was killed with a bullet fired from a .380 caliber gun. Detective Fitzgerald testified that Mr. Greer said that the shooter wore a hooded sweatshirt. The detective said that persons other than the petitioner were initially suspects in the case. One such person was Keion Kendrick. Detective Fitzgerald had obtained a search warrant for Mr. Kendrick's residence because it had been reported that Mr. Kendrick had talked about shooting a little boy; however, the detective testified that "[w]e eliminated Mr. Kendrick [as a suspect] pretty quick[ly]." The picture of a second suspect, Timothy Cartwright, was included in a photographic lineup presented to Mr. Greer and also to

-9-

Monayah Hayes, but neither person identified Mr. Cartwright as the shooter of the victim.

Next, the petitioner's trial attorney testified that he had practiced since 1975, and for 15 to 20 years, 98 percent of his practice had been in criminal law. Counsel testified that in the petitioner's case the discovery materials he had received from the State did not include a copy of the search warrant for Keion Kendrick's residence; however, counsel recalled that the co-defendant Cartwright received a copy of the warrant and that, for this reason, counsel "had it for trial."

Counsel testified that he used an investigator who "interviewed everybody that [the petitioner] wanted us to interview in an effort to try to exonerate him." Counsel recalled that the State's theory at trial was that the petitioner did not shoot the victim but rather was criminally responsible for the shooting of Mr. Greer which the petitioner had solicited. Counsel testified that he did not try to claim that Keion Kendrick was the shooter because the State had discovered that Mr. Kendrick was at another location "way across town" at the time of the homicide.

Counsel testified that the trials of the petitioner and of Timothy Cartwright had been severed and that, although the charges against Mr. Cartwright were ultimately dismissed by the State following the petitioner's trial, the State had not used Mr. Cartwright as a witness against the petitioner.

Counsel opined that the "kicker" in the petitioner's case was "the jailhouse snitch, the person who had information he claimed to have gotten from [the petitioner] that was so detailed that only somebody involved in the offense would have known."

According to counsel, he met with the petitioner on "several occasions," and in addition, the investigator met with the petitioner on other occasions to impart "new information." Counsel said he discussed with the petitioner their trial strategy that the petitioner had not engaged anyone to commit the offense.

The petitioner, 35 years of age at the time of the hearing, testified that his trial counsel had demanded from the State before the trial any exculpatory evidence or materials and that the State responded that it had none. The State's discovery materials did not include a copy of the Kendrick search warrant. The petitioner testified that the warrant showed that two "brown hoodies" were found in Mr. Kendrick's residence. Neither did the materials contain any information on lineup presentations. In his testimony, the petitioner forcefully maintained that the State withheld exculpative evidence concerning the suspicion that Keion Kendrick killed the victim. The petitioner admitted that he had obtained the Kendrick search warrant information from his co-defendant and that he gave it to his counsel. He testified

that he gave the search warrant affidavit to counsel before trial but did not have the information about recovering the hooded sweatshirts at that time. The petitioner also testified that the State withheld a statement that had been given by the victim's neighbor that indicated that she saw Mr. Kendrick in the neighborhood "a day or two prior to the shooting."

The petitioner challenged the neighbor's statement that she had seen the petitioner conversing with Mr. Greer on the ground that, at the time, the petitioner was busy "making a police report for vandalism." The petitioner maintained that the police had a statement from Mr. Greer in which he described the shooter as a man wearing a brown hooded sweatshirt. Additionally, the petitioner was aggrieved that Mr. Kendrick's use of "a white vehicle" in a shooting attack upon a man named Terry Johnson was not used to suggest that the sighting of a white vehicle in connection with the victim's shooting implicated Mr. Kendrick. The petitioner testified that implicating Mr. Kendrick as the shooter was important to his case because the petitioner had no connection to or relationship with Mr. Kendrick that would support the claim that the petitioner had solicited Mr. Kendrick to shoot William Greer. The petitioner stated that the evidence of Kendrick's use of a white vehicle was not disclosed to him by the State.

On a related topic, the petitioner testified that the State withheld evidence that would have enabled him to impeach witness William Greer. Specifically, the petitioner was unaware that Mr. Greer had told Detective Fuqua that Mr. Greer was unable to see the shooter due to darkness.

Concerning his claim of ineffective assistance of counsel, the petitioner claimed that trial counsel failed to interview and utilize 14 witnesses. Counsel failed to call the petitioner's daughter, Monayah Hayes, who therefore never testified that she was unable to identify the person who shot the victim. The other neglected witnesses included Tamika Hudson; Cathy Zoccola; Terry Johnson; Danita Wilson; Detectives Eric Fitzgerald, Tom Jones, and Jim Fuqua; Cleo King; and Officers Burke, J.R. Malone, and Gary Smith.

The petitioner opined that the State's failure to render full discovery hampered his ability to mount a defense that a third party killed the victim.

The petitioner testified that his counsel failed to cross-examine the medical examiner concerning a discrepancy between her report and her testimony as to the number of bullets that had struck the victim.

Next, the petitioner testified that, after his trial, the State dismissed the charge in this case against Timothy Cartwright despite that, in the petitioner's trial, the State had

-11-

theorized that the petitioner had sent Mr. Cartwright to shoot Mr. Greer and that Mr. Cartwright had accidentally shot the victim. The petitioner claimed that, as part of the State's agreement with Mr. Cartwright that led to the dismissal of the first degree murder charge in the present case, Mr. Cartwright was given a sentence of eight years in another case and not 30 years as the prosecutor had claimed.

For purposes of the post-conviction hearing, the parties stipulated that Monayah Hayes, who was 10 years old at the time of the offense, answered the door on the evening of the shooting, did not recognize the person at the door, heard the shooter say "Torrie sent me," and was unable to identify anyone pictured in a photographic lineup presented to her by the police.

The trial court entered an extensive order denying post-conviction relief. The court found that the petitioner had not established that the State had engaged in prosecutorial misconduct relative to the information it had concerning Keion Kendrick. The post-conviction court found that counsel was privy to this information prior to trial and that, because the police had established that Mr. Kendrick was elsewhere at the time of the offense, the information concerning Mr. Kendrick was not useful to the petitioner. The court found that the jury was informed of the failure of Mr. Greer and Monayah Hayes to identify Mr. Cartwright from photographic arrays. The court cited the strong evidence against the petitioner. It stated that counsel in this difficult case "performed all duties expected of a defense attorney in a murder case." The court opined that counsel "presented the best possible defense considering the circumstances of the case."

Now on appeal, the petitioner claims that he suffered the ineffective assistance of trial counsel via counsel's failure to call Monayah Hayes as a witness at trial, failure to call Detective Tom Jones, failure to interview 14 defense witnesses, and failure to object to prosecutorial misconduct. The petitioner also claims that he was prejudiced by prosecutorial misconduct in that the State failed to furnish exculpatory evidence concerning prior statements of Monayah Hayes and Mr. Greer and concerning the evidence that Keion Kendrick, not Timothy Cartwright, shot the victim.

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App.

1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

To establish entitlement to relief via a claim of ineffective assistance of counsel, the defendant must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Should the defendant fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goud v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When reviewing a claim of ineffective assistance of counsel, we will not grant the defendant the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Claims of ineffective assistance of counsel are mixed questions of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the trial court's factual findings, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In the present case, we hold that the petitioner failed to establish by clear and convincing evidence that he was prejudiced by the claimed instances of counsel's deficient performance, and we need not consider whether any cited action or inaction was deficient. The claims relative to the failure to call Monayah Hayes and Tom Jones as witnesses and to interview several other witnesses gain no purchase because the petitioner did not present these persons as witnesses in the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that a post-conviction petitioner generally fails to establish his claim that counsel did not properly investigate or call a witness if he does not present the witness or evidence to the post-conviction court because a post-conviction court

-13-

may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial). Thus, the petitioner failed to establish whether or how any such witnesses could contribute to the defense.

The asserted failure of counsel to take action regarding prosecutorial misconduct appears to be centered around the petitioner's claim that had counsel attempted to show that Keion Kendrick was the shooter, the petitioner would have prevailed at trial, the point being that the petitioner had no prior relationship with Mr. Kendrick, as opposed to Mr. Cartwright, that could serve as a basis for petitioner's recruiting a shooter. The evidence at trial, however, strongly implicated the petitioner as the person who prompted Mr. Cartwright to attempt to kill Mr. Greer. Evidence at trial showed that the petitioner was hostile toward Mr. Greer, who had married the petitioner's former girlfriend, and had previously brandished in Mr. Greer's presence a gun of the same type and caliber that was used to kill the victim. Ms. Greer testified that the petitioner often threatened to do harm to Mr. Greer. Mr. Cartwright had a relationship with the petitioner's sister, and telephone records for the time before and after the shooting showed that the petitioner used his cellular telephone on multiple occasions to speak with someone using Mr. Cartwright's cellular telephone. Kelvin Burke testified that the petitioner had solicited him to kill Mr. Greer and that after the victim was killed, the petitioner told Mr. Burke about Mr. Cartwright's bungling of the shooting. Mr. Burke's account revealed that the petitioner had spoken of details of the event, including that the petitioner saw Monayah Hayes open the door and that the only evidence the police had was a "cell phone." Against this evidence, the petitioner wants to pose evidence that remains speculative in nature that Keion Kendrick shot the victim. Thus, the petitioner has failed to show that had additional evidence been used the result of the trial probably would have been different.

The other issue raised by the petitioner in this case is the stand-alone claim of prosecutorial misconduct relative to the failure to inform the defense of exculpative evidence.

In reviewing allegations of prosecutorial misconduct, this court looks to see "whether such conduct could have affected the verdict to the prejudice of the defendant." *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). That analysis involves consideration of five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of

the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The petitioner's allegation of prosecutorial misconduct as a stand-alone issue in this case, however, is waived for failure to present it on direct appeal. A ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). We note that the petitioner did not show that he obtained any of the information after this appeal.

For the reasons explained above, we affirm the post-conviction court's denial of post-conviction relief.

_____
JAMES CURWOOD WITT, JR., JUDGE